[No. B239867. Second Dist., Div. Five. Nov. 26, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMIEKIA JOHNSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Background, parts A.2. and A.3., and Discussion, parts A. and C. through G.

**COUNSEL**

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, Acting P. J.—**

## INTRODUCTION

Defendant and appellant Tomiekia Johnson (defendant) was convicted of the first degree murder of her husband, Marcus Lemons (Lemons). (Pen. Code, §§ 187, subd. (a), 189.)[1] On appeal, defendant contends, inter alia, that her statutory and constitutional rights to be present at trial were violated when the trial court, without defendant being present, allowed the bailiff to demonstrate the operation of the murder weapon in response to a jury request and to respond to questions from the jury about how the weapon operated.

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

■ In the published portion of this opinion, we hold that the trial court erred by allowing the bailiff, without the presence of defendant, to conduct for the jury a demonstration of how the murder weapon operated and answer jury questions about that subject, but that error was not prejudicial because defendant was present when the prosecution's expert provided testimony that was consistent with the bailiff's communications with the jury. The failure of defendant's counsel to object to the colloquy between the bailiff and the jury forfeited any contention concerning that process. We affirm the judgment of conviction.

## BACKGROUND

### A.  Factual Background

#### 1.  Summary of Evidence

A surveillance video from the inside of a bar showed Lemons and defendant drinking at the bar on February 21, 2009. Later that evening, the driver of a car and her passenger observed a physical altercation between a female and a male outside their car and noticed that when the female departed in the couple's car, they only saw the female's head; neither the driver nor her passenger saw the male. They testified the man and woman were African-Americans, and that the man wore a baseball hat. Their descriptions of the man and the woman were consistent with the physical appearance of defendant and Lemons in the video at the bar, and with the hat subsequently recovered near Lemons's body.

In response to a 911 call from defendant's mother, the police found Lemons's body in defendant's car parked outside her mother's house. Lemons had suffered a fatal gunshot wound to the head. Defendant was arrested. The police found in the car a .25-caliber semiautomatic handgun, loaded with a magazine containing five rounds and one round in the chamber. Just behind the driver's seat there was an expended .25-caliber shell casing. The hammer on the gun was in the cocked position, and the safety lever was in the center position.

A deputy medical examiner concluded that based on the trajectory of the bullet and the wound, the gun was in a position above and to the right of Lemons when it was fired and that the gun was in contact or near contact with Lemons's head. She further opined that Lemons was seated on the front passenger seat, and the shooter was standing near the front passenger doorframe.

At the time of the shooting, defendant was a seven-year veteran California Highway Patrol (CHP) officer. Nevertheless, she had a history of making threats, firing her weapon, and engaging in threatening conduct, including against Lemons.

According to defendant, she and Lemons argued on the way home from the bar on the evening of February 21, 2009, and she exited the car to walk home. She thought Lemons was going to reach for a gun that she believed was in her purse that she left in the car. Lemons was in the passenger seat with one foot on the ground. When defendant saw the gun on the ground on the passenger side of the car, she was afraid Lemons would get it so she picked it up, squeezed the gun tightly, and, in so doing, it fired accidentally, striking Lemons. She drove him to her parents' house and told them to call 911 because she had shot and killed Lemons. Defendant's firearms and trajectory reconstruction expert said that Lemons did not suffer a contact wound and that there was not sufficient evidence to determine Lemons's position when he was shot.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.  *Procedural Background*

The Los Angeles County District Attorney filed an information charging defendant with one count of murder. (§ 187, subd. (a).) It was alleged that defendant personally and intentionally discharged a firearm which caused great bodily injury and death (§ 12022.53, subd. (d)), that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that defendant personally used a firearm (§ 12022.53, subd. (b)).

The jury found defendant guilty of first degree murder and the firearm allegations true. The trial court sentenced defendant to state prison for a term of 50 years to life.

### DISCUSSION

A.  *Sufficiency of Evidence for First Degree Murder**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 943.

## B. *Right to Be Present*

Defendant contends that her statutory and constitutional rights to be present at trial were violated when, without her presence, the trial court in response to a jury request allowed the bailiff to demonstrate, and answer questions about, the operation of the murder weapon. As set forth above, the evidence at trial showed that after an evening of drinking, defendant and Lemons argued on their way home from a bar. After defendant stopped and exited her vehicle, she shot Lemons at close range with a handgun while he was seated in the passenger seat of the car. Defendant claimed that the handgun discharged accidentally, but, after considering the evidence, including expert witness testimony about the operation of the handgun, the jury rejected that claim. We conclude that although the trial court erred, the error was harmless.

### 1. *Applicable Law*

■ The California Supreme Court has summarized the law relating to a criminal defendant's right to be present at proceeding as follows: " 'A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by sections 977 and 1043.' [Citation.] 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' [Citation.] 'Due process guarantees the right to be present at any "stage that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." ' [Citation.] ' "The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]" [Citation.] Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]' [Citation.] 'Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial.' [Citation.]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 798–799 [130 Cal.Rptr.3d 191, 259 P.3d 370], fn. omitted.)

The presence of a defendant is not required for certain legal and procedural discussions. For example, the California Supreme Court has noted that "a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*People v. Perry* (2006) 38 Cal.4th 302, 312 [42 Cal.Rptr.3d 30, 132 P.3d 235]; see *People v. Lopez* (2013) 56 Cal.4th 1028, 1051 [157 Cal.Rptr.3d 570,

301 P.3d 1177] [a defendant does not have the right to be present in chambers or at bench discussions outside the jury's presence on questions of law]; *People v. Butler* (2009) 46 Cal.4th 847, 865 [95 Cal.Rptr.3d 376, 209 P.3d 596] [discussion of jury instructions is not a critical stage of the proceedings requiring a defendant's presence]; *People v. Rogers* (2006) 39 Cal.4th 826, 855–856 [48 Cal.Rptr.3d 1, 141 P.3d 135] [a defendant's right to attend a counsel's jury screening discussions]; *People v. Avila* (2006) 38 Cal.4th 491, 598 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [rereading of testimony is not a critical stage of a criminal proceeding]; *People v. Riel* (2000) 22 Cal.4th 1153, 1196 [96 Cal.Rptr.2d 1, 998 P.2d 969] [the defendant's presence at discussions concerning television coverage, jury instructions, or which exhibits to send to the jury "would neither have contributed to the fairness of the procedure nor have affected the fullness of his opportunity to defend against the charges"]; *People v. Ervin* (2000) 22 Cal.4th 48, 72 [91 Cal.Rptr.2d 623, 990 P.2d 506] [a defendant has no absolute right to be present during a hardship screening]; *People v. Johnson* (1993) 6 Cal.4th 1, 17–20 [23 Cal.Rptr.2d 593, 859 P.2d 673] [the dismissal of a juror for misconduct is not a proceeding at which the defendant must be present], disapproved on other grounds in *People v. Rogers, supra*, 39 Cal.4th at p. 879; see also *Kentucky v. Stincer* (1987) 482 U.S. 730 [96 L.Ed.2d 631, 107 S.Ct. 2658] [a defendant may be excluded from a conference on the competency of child witnesses]; *United States v. Gagnon* (1985) 470 U.S. 522, 526–527 [84 L.Ed.2d 486, 105 S.Ct. 1482] [trial court's ex parte discussion with a juror was not at a critical stage of the proceedings].)

The California Supreme Court also has explained, "Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice. [Citations.]" (*People v. Perry, supra*, 38 Cal.4th at p. 312.) " 'A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that [the defendant's] personal presence could have substantially benefited the defense. [Citation.]' [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 408 [3 Cal.Rptr.2d 106, 821 P.2d 610], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161 [68 Cal.Rptr.2d 440].) As the Court of Appeals for the Ninth Circuit pointed out, "The [United States] Supreme Court has 'adopted the general rule that a constitutional error does not automatically require reversal of a conviction . . . and has recognized that most constitutional errors can be harmless.' [Citation.] Automatic reversal due to a constitutional error is required only if this error was a 'structural defect' that permeated '[t]he entire conduct of the trial from the beginning to end' or 'affect[ed] the framework within which the trial proceeds.' [Citation.] If the error was simply a 'trial error,' on the other hand, a court conducts a harmless-error review. . . . [¶] The list of structural errors that the Supreme Court has recognized is short and limited. . . . [¶] The

[United States] Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error. To the contrary, in *Rushen v. Spain*, 464 U.S. 114, 117 [78 L.Ed.2d 267, 104 S.Ct. 453] (1983) (per curiam), the Court determined that the fact that the defendant was denied the right to be present during an *ex parte* communication between the judge and a juror was a trial error that was subject to harmless error analysis. The court explained that the right to be present during all critical stages of the proceedings and the right to be represented by counsel, 'as with most constitutional rights, are subject to harmless error analysis unless the deprivation, by its very nature, cannot be harmless.' *Id.* at 117 n. 2 . . . (citations omitted)." (*Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1171–1172.) Thus, an error pertaining to defendant's presence involving a federal constitutional right is evaluated under the "harmless-beyond-a-reasonable-doubt standard." (*People v. Davis* (2005) 36 Cal.4th 510, 532 [31 Cal.Rptr.3d 96, 115 P.3d 417]; see *Chapman v. California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### 2. *Forensic Evidence*

#### (a) *Criminalist Keil*

Robert Keil, a Los Angeles County Sheriff's Department senior criminalist, testified about the operation of the handgun recovered from the purse found in defendant's car. Keil used a photograph of a firearm to, as he testified, "depict[] the hammer, which is in this particular position in the forward or uncocked position. . . . The trigger, which is essentially connected to the firearm to the position that holds the hammer in a cocked position so that when it's depressed, the hammer can be released. . . . The slide, which is the part that moves back and forth on a semiautomatic firearm such as this. It controls the operation after firing, the removal, extraction, and ejection of a fired cartridge case. That is the purpose of this slide mechanism as it comes to the rear, pulls that out, extracts and ejects that. As it comes forward, takes another live round off the magazine and chambers it. [¶] The safety mechanism. In this case it's a lever-type safety on the left side of the firearm that swings in this example 180 degrees. So as depicted, this is in a ready-to-fire position. If it were rotated 180 degrees to the front, it would be in a safe position."

Using another photograph of a gun, Keil explained, "This particular safety mechanism on this firearm rotates 180 degrees. It has what's known as a detent or a depression in the frame that as you push it around to engage the safety, it sort of holds it or keeps it there more tightly. So in this position it's held in the . . . completely off position, [and] can be rotated around using typically your thumb. If you're right-handed, you'd use your right thumb to

rotate it around and engage it in the forward position which would be safety on. [¶] In this particular firearm, . . . [t]he safety will be engaged from six o'clock or greater, meaning that you cannot pull the trigger. [¶] If it's between six o'clock and three o'clock, you will be able to fire the firearm. So it will discharge."

Keil testified that there was an "F" on the gun. According to Keil, when the "F" was showing, the gun was ready to fire. He stated, "F is for 'fire,' meaning that it will discharge with the safety in the position as depicted. [¶] . . . [¶] [If I move the safety lever] instead of an F, underneath the lever as it is right now you would see an S for 'safe.' "

Keil further testified that he had test-fired defendant's pistol and determined it was functional. He also performed a "push off" examination, which is a test performed by using one's thumb to push down the cocked hammer in an attempt to disengage its mechanism without touching the trigger. Keil determined that he could not disengage the hammer with his thumb.

The prosecutor asked Keil, "Can you tell us how this gun works? [¶] You called it a single-action." Keil responded that as opposed to a double-action firearm, "a single-action mode of fire, means that the hammer must be in a cocked position before you attempt to fire it. So the operator can thumb it back, meaning they pull it to the rear where it's held by the internal mechanisms of the firearm until the trigger is depressed, in this case [requiring] at least seven and a half pounds of force, at which time the firearm will release the hammer, the hammer will fall forward, strike the firing pin, the firing pin will ram itself into the primer, causes sparks and flame to go into the gunpowder. That expanding gas operates the top of the firearm known as the slide, bullet leaves down range, slide moves to the rear, and what this does is pulls that fired cartridge case out of the chamber, extracts it and ejects it free of the firearm. As the slide gets all the way to the back and starts moving forward, it takes another live round, if it's present in the magazine, and pushes it into the chamber at the same time recocking the hammer. [¶] The operator then would release the pressure from the trigger and re-depress it if they wish to fire it a second time, hence the name 'semi-automatic.' The trigger can't be held to the rear and continue to be fired. You must release it and re-depress it for subsequent shots."

Using a Titan .25-caliber semiautomatic pistol, i.e., the same type of weapon used in Lemons's shooting, Keil further explained its operation, stating, "[A]t this point the firearm is in a cocked position because the slide has been to the rear. The hammer is held to the rear. . . . If this had been loaded with a unit of ammunition, it would be in a position where it could be fired. In this case the safety mechanism is on. The operator would rotate it to

the rear, at which point I could apply pressure to the trigger, and the hammer will discharge. The hammer will fall forward striking the firing mechanism and then beginning the process of a cycling where the fired cartridge case will come out of this part on the top and to the rear, and the next live round will come forward as it moves forward. Again, cocking the hammer. [¶] . . . [¶] So that is the operation of this. It is a single-action, meaning that the hammer must be in a cocked position to fire. If it is not, pulling the trigger accomplishes nothing. It does not function. In a cocked position, putting seven and a half pounds of pressure on the trigger will cause the hammer to be discharged or fall forward."

In response to the prosecutor's request that Keil demonstrate for the jury how one could pull back on the slide to shoot the gun, Keil testified, "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and what this . . . movement does [is to cause] that first live round to be pushed up inside the magazine a little bit, and part of the slide mechanism actually pushes on the back of it and pushes it into the chamber, and what this accomplishes is even if this hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply, provided the safety is off, apply pressure to the trigger and discharge it."

Keil test-fired the Titan pistol to see what the "natural sweep position would be of [the] safety mechanism" before he shot it. He did so to "educate myself on how this safety mechanism operates. I put it in a cocked condition. I rotated that lever so that the knurled part is facing the front of the firearm which is in a safe position, I can see the letter S for 'safe,' verified that . . . by pushing the trigger [I could not fire it]. . . . And I tried sweeping the hammer down with my thumb, sweeping it down to see how fast I could disengage [the safety], and when I did that, I noted what position it went in. [¶] So with the natural movement of my thumb as I sweep it down, if I simply sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger."

### (b)  *Bailiff's Demonstration*

During deliberations, the jury requested a reading of defendant's testimony about how the gun discharged, an opportunity to view the gun, and a demonstration of the gun's "safety, hammer, & trigger." In response to those requests, the following exchange occurred between and among the trial court and counsel: "[Trial court]: We are outside the presence of the jury. . . . The defendant is not present. [Defendant's counsel], what are your thoughts on

whether [defendant] has to be here? [¶] [Defendant's counsel]: I traditionally, your honor, waive my client's appearance, particularly when they're out of custody. I spoke with her this morning. I just texted earlier and told her that the jury wanted to read some of the transcript regarding her testimony about the gun and her description during direct examination and she said she'd rather not be here for that and it was okay if I represented her interest. [¶] [Trial court]: So you're waiving her appearance? [¶] [Defendant's counsel]: Yes, Your Honor. [¶] [Trial court]: That's agreeable to the court."

Regarding the jury's request for a demonstration of the operation of the gun, the following exchange occurred outside the presence of the jury: "[Trial court]: The other thing we have to discuss is the second note ask[ing] for viewing of the gun and demonstration of safety, hammer[,] and trigger. [¶] To me this is a significant issue. I don't know how you want to handle it. The Bailiff is prepared to show the jurors the gun and to demonstrate the use of the safety and the hammer and the trigger if that is acceptable. I don't know what else we can do. I'm seeking some advi[c]e here. How would counsel want to proceed in response to this request to [view] the gun and to demonstrate the safety[,] hammer[,] and the trigger. [¶] [Prosecutor]: I'm in agreement with the trial court's suggestion. [¶] [Defendant's Counsel]: I don't think you can do it any other way, your Honor. The Bailiff obviously will be instructed not to answer any questions or any inquiries. [¶] [Trial court]: Well, let's do it in open court. Just have him . . . do it. In fact, . . . I'll take him through it and say, okay, show the jurors where the safety is and he can show them where the safety is. And I will ask him, how . . . do you fire the gun and have him do the slide and pull the trigger and pull the hammer back. Are we okay with that? [¶] [Prosecutor]: I'm fine with that. [¶] [Trial court]: The other option is to give the jurors the gun, and we just don't do that as a rule . . . ."

Then the following occurred in the presence of the jury: "[Trial court]: Good morning everyone. We are with the jury and we're going to be responding to the jurors' inquiry. We have two notes from the jury. First of all, I'm going to explain that [defendant] has waived her appearance for this response to your questions. We have questions. I want to take up the question regarding testimony second. Let's deal with the first question which is you have asked to view the gun and you've asked for a demonstration of the safety, hammer[,] and trigger. And so the Bailiff has the gun and he's going to walk over in front of you and he'll show you where the safety is. [¶] [Bailiff]: Safety is right here (indicating). [¶] [Trial court]: [Bailiff], can you show the safety to the on position and off position. [¶] [Bailiff]: Right now the safety is on safe. Safe means that the lever is moved forward. To fire the weapon, I'll rotate [the] lever backwards and there will be a little 'F' there. It's ready to fire. [¶] Juror No. 3: If you were to fire the gun and you've never used it before, I'm looking at like time wise, how much time does it take you to

release the safety, pull back the hammer or the slide or whatever it is and fire? Does it take you a second? . . . [¶] [Bailiff]: You can do it if you . . . are proficient with the weapon, you can do it in a second. [¶] Juror No. 3: Okay. Do the hammer. [¶] Juror No. 11: Do it again. [¶] [Bailiff]: Right now it's on safe. Okay, if I pull it back.—[¶] Juror No. 10: Is that the only way to do the hammer? .[¶] [Bailiff]: Another way to do the hammer is this way. [¶] Juror No. 3: So if that gentleman there—can you grab the gun from the front please. [¶] [Trial court]: We're getting way far afield. [¶] Juror No. 11: Repeat that so we can see what it takes to fire. [¶] [Bailiff]: Right now it's on safe. I can't fire. It's not cocked back. Now, if I want to fire it—[¶] [Trial court]: What if you cocked the hammer? [¶] [Bailiff]: Cocked the hammer. [¶] Juror No. 11: It's on safe. [¶] [Bailiff]: It's on safe. I can't fire it if it's on safe. [¶] Juror No. 6: So unsafe it and then shoot. [¶] [Bailiff]: Unsafe it. [¶] Juror No. 8: The slide is already pulled. [¶] [Bailiff]: I have to put a round in the chamber first to fire. If there was a magazine in here. Right now it's on safe, I can't fire. If I wanted to fire—[¶] Juror No. 3: Can you push the safety back at 6:00. [¶] [Bailiff]: It will still fire. [¶] Juror No. 3: At 5:00 or 6:00? [¶] [Bailiff]: It's at 6:00 right now. [¶] Juror No. 3: It went off at 6:00. Okay. [¶] [Bailiff]: At 5:00 it won't. [¶] Juror No. 10: What's 7:00? [¶] [Bailiff]: Oh, I'm looking at it this way. It's at 6:00. [¶] Juror No. 3: At 6:00. [¶] [Bailiff]: I can't fire this. You move it a little bit more at 6:00, it'll fire at 6:00. [¶] Alternate Juror No. 1: You said it will or won't fire? [¶] [Bailiff]: It will fire at 6:00. [¶] Alternate Juror No. 1: When you swing the lever, does it click? [¶] [Bailiff]: No, the lever does not click when I swing it. [¶] Alternate Juror No. 1: So what's the mechanism between disabling and abling a gun? [¶] [Bailiff]: I know how it is internal. [¶] Juror No. 11: But you have to pull the back down or rack? [¶] [Bailiff]: Yeah, I would have to rack it to pull the hammer back. So right now it's ready to fire, but it's on safe. The only way I can fire it, if I pull the lever back from 5:00—from safety to fire and then I can fire the weapon. [¶] Juror No. 10: Can you do it with your thumb instead of the racking? [¶] [Bailiff]: What do you mean? [¶] Juror No. 10: The handle, cock? [¶] [Bailiff]: Oh, yes. [¶] Juror No. 9: Can you reach the safety with your thumb? [¶] [Bailiff]: Well, I could. [¶] Juror No. 9: You're an expert. [¶] Juror No. 3: And on the slide, do you have to pinch the sides or can you pull it from the top? Does the top slide? [¶] [Bailiff]: This top? [¶] Juror No. 3: Yeah, right there. See, the—[¶] [Bailiff]: This part, you have to pinch it on both sides. Okay. That's why you have the little grooves, so you can get a hold of it to slide it back. That's one way. [¶] [Trial court]: Look, I'm getting uncomfortable. I think we've done enough. If you have additional questions, we'll try to answer them."

### 3. *Analysis*

The trial court erred in depriving defendant of her statutory and constitutional rights to be present during the bailiff's demonstration. As explained

above, defendant had a right to be present at each critical stage of the trial, and because it amounted to the jury's receipt of evidence, the bailiff's demonstration constituted a critical stage of defendant's trial.

"In all cases in which a felony is charged, the accused shall be present . . . during those portions of the trial when evidence is taken before the trier of fact . . . ." (§ 977, subd. (b)(1).) " 'Evidence' means testimony . . . or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law . . . ." (Evid. Code, § 710.) Evidence Code section 165 states, " 'Oath' includes affirmation or declaration under penalty of perjury."

Without defendant present, the bailiff spoke extensively[2] to the jury about, and demonstrated for the jury, the operation of the gun's safety and hammer, including their effect on the gun's ability to fire, the time it takes to release the gun's safety, and the "racking" of the gun to ready it for firing—pulling back on the slide thereby cocking the hammer. The bailiff responded to a number of questions posed by the jurors, and one of the jurors at that time expressly characterized the bailiff as "an expert."

Although the bailiff was not a sworn witness, his "demonstration" essentially amounted to testimony. Even if the bailiff's remarks were not testimony, they resulted, in effect, in the jury's receipt of evidence. (*People v. Bolin* (1998) 18 Cal.4th 297, 325 [75 Cal.Rptr.2d 412, 956 P.2d 374] ["Although a jury view is not among the designated proceedings in section 977, we have long held that 'in so viewing the premises the jury was receiving evidence' even if nontestimonial."].) Therefore, the trial court erred by allowing the bailiff to demonstrate to the jury the operation of the gun, including answering the jurors' questions, without defendant being present because the demonstration was a critical stage of the trial proceedings.

The Attorney General argues that there was no error because defense counsel waived defendant's presence. There was, however, no valid waiver of defendant's statutory right to be present during the bailiff's demonstration. As noted, section 977, subdivision (b)(1) required defendant "[to] be present . . . during those portions of the trial when evidence is taken before the trier of fact . . . ." A written waiver executed by a defendant is required for a defendant to waive his or her presence at such a hearing. (§ 977, subd. (b)(2).) Defendant did not execute a written waiver of her right to be present at the bailiff's demonstration, and, therefore, there was not a valid waiver under section 977.

---

[2] The bailiff's demonstration to the jury is recorded in approximately three and one-half pages of the reporter's transcript.

Even if defendant's counsel could waive defendant's constitutional and statutory rights to be present at the bailiff's demonstration, there was no valid waiver. In *Larson v. Tansy* (10th Cir. 1990) 911 F.2d 392, the defendant was found guilty of criminal sexual penetration and sentenced to life imprisonment. During trial, the defendant spent much of the time with his head on the counsel table and never talked to his trial counsel. At the conclusion of all testimony, the trial court told the defendant's counsel that the defendant could leave the courtroom if counsel would waive his presence. Defense counsel agreed, the defendant was escorted back to the psychiatric hospital to which he had been admitted, and defense counsel represented that the defendant was voluntarily absenting himself from the proceedings. The defendant was absent for the remainder of his trial, including the jury instruction conference, jury instructions, closing arguments, and the rendering of the verdict. (*Id.* at p. 393.)

The court in *Larson v. Tansy, supra,* 911 F.2d at page 394 said "that defendant had a constitutional right to be present at the jury instructions, the closing statements, and the rendering of the verdict." In holding that there was not a valid waiver of the defendant's right to be present at those proceedings, the court stated, "The record indicates defendant's counsel, and not defendant, waived defendant's right of presence at trial. The trial court never directly addressed defendant concerning his counsel's request to conduct the remainder of the trial in defendant's absence. We hold that defendant did not waive his right to be present. [¶] Several circuits have held that defense counsel cannot waive a defendant's right of presence at trial. [Citations.]" (*Id.* at p. 396.) The court added, "[T]wo circuits that have allowed a defendant's counsel to waive his client's right of presence both involve counsel that at least communicated with their clients the need or possibility for attendance at trial. *Wilson v. Harris,* 595 F.2d 101, 104 (2d Cir. 1979); *United States v. Dunlap,* 577 F.2d 867, 868 (4th Cir.), *cert. denied,* 439 U.S. 858 [58 L.Ed. 2d 166, 99 S.Ct. 174] (1978). No such communication took place in this case. Even if defense counsel could have validly waived defendant's right to be present for the conclusion of his trial, where defense counsel did not consult with defendant concerning the waiver and did not obtain defendant's consent, the waiver will not be binding on defendant. [Citations.]" (*Id.* at fn. 2.)

■ In *People v. Davis, supra,* 36 Cal.4th 510, our Supreme Court stated, "It does not appear that we have addressed the question whether defense counsel may waive the defendant's presence. Some federal cases that have addressed this issue have held that defense counsel may do so, but only if there is evidence that the defendant consented to the waiver. (E.g., *Carter v. Sowders* (6th Cir. 1993) 5 F.3d 975, 981–982; *Larson v. Tansy*[*, supra,*] 911 F.2d [at pp.] 396–397; but see *United States v. Gordon* (D.C. Cir. 1987) 264 U.S. App. D.C. 334 [829 F.2d 119, 125–126] [personal on-the-record

waiver of presence right required].) At a minimum, there must be some evidence that the defendant understood the right he was waiving and the consequences of doing so. (See *United States v. Nichols* (2d Cir. 1995) 56 F.3d 403, 416–417.) [¶] Here, there is scant evidence of consent, and even less evidence that defendant understood the right he was waiving and the consequences of his waiver. All the record shows is that defense counsel represented to the court that counsel had discussed the hearing with defendant and that defendant would waive his presence. There is no evidence that defense counsel informed defendant of his right to attend the hearing; nor is there evidence that defendant understood that by absenting himself from the hearing he would be unable to contribute to the discussion . . . . Accordingly, we cannot conclude that defendant knowingly and intelligently waived his right to presence at the hearing." (*Id.* at p. 532, fn. omitted.)

Here, defendant's counsel purportedly waived defendant's presence, but the record reflects only that defendant's counsel advised defendant that the jury wanted a transcript of some of defendant's testimony and, on that basis, she orally agreed with defendant's counsel to waive her presence. There is nothing in the record showing that defendant knew about the proposed demonstration or that the bailiff would answer questions from the jurors. Based on the record, the oral waiver of defendant's presence by defendant's counsel, at most, related only to the jury's request for a transcript of some of defendant's testimony. Thus, defendant did not waive her constitutional rights to be present at the bailiff's demonstration.

The trial court's error in connection with the bailiff's demonstration in defendant's absence does not require a reversal because it was harmless beyond a reasonable doubt. (*People v. Martinez* (2009) 47 Cal.4th 399, 424 [97 Cal.Rptr.3d 732, 213 P.3d 77].) The bailiff's demonstration, which included answering the jurors' questions, although improper, was in substance materially the same as Keil's testimony.[3] Keil, like the bailiff, demonstrated for the jury, and spoke to the jury about, the weapon's operation including, inter alia, the location, use, and effect of the gun's safety, hammer, and slide.[4] In addition to being similar to the bailiff's demonstration, Keil's

---

[3] In the attached appendix, we set forth a comparison of relevant portions of Keil's testimony and the bailiff's description of his demonstration.

[4] Defendant contends that she was prejudiced by the bailiff's demonstration because Keil testified about the operation of the handgun using a diagram of the handgun, and the bailiff demonstrated the operation of the handgun using the actual handgun. There was no material difference between Keil's testimony using a diagram, and the bailiff's demonstration using the actual handgun. (Cf. *People v. Duenas* (2012) 55 Cal.4th 1, 20 [144 Cal.Rptr.3d 820, 281 P.3d 887] [diagrams are demonstrative evidence]; *People v. Collins* (2010) 49 Cal.4th 175, 255–256 [110 Cal.Rptr.3d 384, 232 P.3d 32] [a jury's demonstration and use of a diagram during jury deliberation was not prejudicial jury misconduct because they were based on the evidence admitted at trial].)

testimony concerning the operation of the gun was substantially more extensive than that demonstration. Defendant was present during Keil's testimony, and her counsel cross-examined him. Any issues defendant had concerning the accuracy, characterization, or relevance of Keil's testimony could have been raised by objection during Keil's testimony on direct examination, or by defendant's counsel during his cross-examination of Keil.

In addition, defendant testified about her extensive knowledge of firearms, but she did not testify about Keil's testimony or otherwise challenge the manner in which he characterized the operation of the gun. Also, defendant did not offer the testimony of an expert witness to contradict Keil's testimony concerning the operation of the gun, or explain how the gun could discharge accidentally if, as defendant testified, she "squeezed" the gun or held it "tightly" and did not "try to pull the trigger." Moreover, defendant's firearms and trajectory reconstruction expert did not disagree with Keil's testimony concerning the operation of the gun.

Defendant contends that, in a response to one juror's question, the bailiff stated during his demonstration that if a shooter was proficient with the weapon, he or she could release the safety, pull back the hammer or the slide, and fire the gun "in a second." Defendant argues that she was prejudiced by her improper absence during the bailiff's demonstration because Keil did not testify about the time it takes to perform those tasks, and she did not have an opportunity to address the subject.

With respect to the time it takes to perform one of the two steps described by the bailiff—disengaging the safety—Keil testified that in performing a test on the gun, ". . . I tried sweeping the hammer down with my thumb, sweeping it down to see how fast I could disengage [the safety] . . . . [¶] So with the natural movement of my thumb as I sweep it down, if I *simply* sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger." (Italics added.) This testimony suggested that a person proficient in the use of handguns, such as defendant, who "simply" swept his or her finger in the manner described by Keil could ready the gun to fire quickly. Thus, defendant could have cross-examined Keil on the issue of how quickly the gun could have been readied to fire. In addition, defendant testified that she did not know whether the gun had the safety on or whether "the hammer was cocked" when she picked up the gun and shot Lemons. Based on that testimony, there was no way to know if, just before defendant

shot Lemons, the safety was engaged and the hammer was not cocked (by pulling back the hammer or the slide). Therefore, anything the bailiff said concerning how fast a gun could be readied to fire was of no consequence.

Defendant next contends that the error was prejudicial because, unlike the bailiff, Keil testified that "if the gun were cocked and the safety on, the safety could accidentally disengage and the gun could fire by putting pressure on the trigger." Defendant argues that had she been present, she "could have pointed out that the bailiff's demonstration failed to represent accurately how she maneuvered the gun." The challenged portion of Keil's testimony, however, concerned whether it was advisable to carry a gun in a person's pocket, and there was no testimony in the record that the gun was in defendant's pocket immediately before she shot Lemons. In addition, as noted above, defendant testified that she did not know whether the gun's safety was on or whether "the hammer was cocked" when she picked up the gun.

Further, the prosecution's forensic evidence rebutted defendant's contention that she squeezed the gun tightly and it fired accidentally. That evidence showed that Lemons's wound was caused by a shot from a gun that was placed on or very near Lemons's head, and at the time Lemons was shot he was seated in the car and defendant was standing near the passenger doorframe. The evidence also reflected that for the gun to fire, over seven pounds of force had to be applied to the trigger. Thus, Keil's testimony covered the substance of the bailiff's demonstration and was more extensive. The demonstration during defendant's absence from the courtroom was therefore harmless beyond a reasonable doubt. (*People v. Martinez, supra*, 47 Cal.4th at p. 424; *Chapman v. California, supra*, 386 U.S. at pp. 22, 24.)

In addition, defendant's counsel acceded to the bailiff's demonstration in defendant's absence. Although defense counsel conditioned his agreement to allow the demonstration on the basis that the bailiff not answer questions, once the bailiff began to answer jurors' questions, defense counsel did not object. Thus, there was a forfeiture of any claim of error with respect to the bailiff's conduct, apart from the issue of defendant's absence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

C.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 943.

## DISPOSITION

The judgment is affirmed.

Kriegler, J., and Kumar, J.,* concurred.

A petition for a rehearing was denied December 11, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 26, 2014, S215553.

.

.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## APPENDIX

1. <u>SUBJECT</u>: The Safety's On and Off Positions.

| KEIL | THE BAILIFF |
|---|---|
| A. Keil testified that as depicted in a photograph, the firearm's safety was off, but "[i]f [the safety lever] was rotated 180 degrees to the front, it would be in a safe position." | A. "Right now the safety is on safe. Safe means that the lever is moved forward. To [disengage the safety], I'll rotate [the] lever backwards and there will be a little 'F' there." |
| B. "The safety will be engaged from six o'clock or greater . . . ." | B. "Right now it's on safe." |
| C. If the safety is between "six o'clock and three o'clock" you will be able to fire the firearm. | C. The safety is on when the safety lever is in a "5:00" position. |
| D. "[If I move the safety lever] instead of an F [for 'fire'], underneath the lever as it is right now you would see an S for 'safe.' " | D. The safety is off when the safety lever is in the "6:00" position. |
| E. "In this case the safety mechanism is on" | E. "[R]ight now it's ready to fire, but it's on safe." |

2. <u>SUBJECT</u>: The Safety's Effect.

| KEIL | THE BAILIFF |
|---|---|
| A. As depicted in a photograph, the firearm is in a "ready-to-fire position." | A. When the safety is off, the gun "[is] ready to fire." |
| B. When the safety is engaged "you cannot pull the trigger . . . ." | B. "Right now it's on safe. I can't fire [the gun]." |
| C. "If [the safety lever is] between six o'clock and three o'clock, you will be able to fire the firearm. So it will discharge." | C. If the hammer is cocked and the safety is on, "I can't fire [the gun]." |
| D. When the safety lever is moved to the "F" depicted on the gun, "the gun is ready to fire." | D. "Right now it's on safe, I can't fire." |
|  | E. The gun "will still fire" when the safety is off—i.e., when the safety lever is in a 6:00 position. |

| KEIL | THE BAILIFF |
|---|---|
| E. The gun "will discharge with the safety in the position as depicted." | F. The gun will not fire when the safety is on—i.e., when the safety lever is in a 5:00 position. |
| F. "The operator would rotate [the safety lever] to the rear, at which point I could apply pressure to the trigger, and the hammer will discharge." | G. "You move [the safety lever] a little bit more at 6:00, it'll fire at 6:00." |
| | H. "It will fire at 6:00." |
| G. "[P]rovided the safety is off, [I can] apply pressure to the trigger and discharge [the gun]." | I. "[I]f I pull the lever back from 5:00— from safety to fire[,] . . .then I can fire the weapon." |

3. <u>SUBJECT</u>: The Hammer.

| KEIL | THE BAILIFF |
|---|---|
| A. A graphic photograph of the firearm "depicts the hammer . . . in the forward or uncocked position." | A. The bailiff pulled the hammer in the direction of the rear of the gun. |
| B. "[A] single-action mode of fire . . . means that the hammer must be in a cocked position before you attempt to fire it." | B. The bailiff showed the jury "[a]n-other way" to cock the hammer. |
| C. "[T]he operator can thumb [the hammer] back, meaning they pull it to the rear where it's held by the internal mechanisms of the firearm until the trigger is depressed . . . at which time the firearm will release the hammer [and the gun will fire]." | |
| D. While the gun is firing, the slide "recocks" the hammer. | |
| E. "[A]t this point the [trigger] is in a cocked position because the slide has been to the rear." | |
| F. "The hammer will fall forward striking the firing mechanism . . ." and ultimately the firing process "cock[s] the hammer." | |

| KEIL | THE BAILIFF |
|---|---|
| G. "It is a single-action, meaning that the hammer must be in a cocked position to fire. If it is not, pulling the trigger accomplishes nothing. It does not function. In a cocked position, putting . . . pressure on the trigger will cause the hammer to be discharged or fall forward."<br><br>H. "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and . . . even if this hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply . . . apply pressure to the trigger and discharge [the gun]." | |

4. <u>SUBJECT</u>: The Slide.

| KEIL | THE BAILIFF |
|---|---|
| A. "The slide . . . is the part that moves back and forth on a semiautomatic firearm such as this. It controls the operation of firing, the removal, extraction, and ejection of a fired cartridge case. That is the purpose of this slide mechanism as it comes to the rear, pulls that out, extracts and ejects that. As it comes forward, takes another live round off the magazine and chambers it."<br><br>B. While the gun is firing, "the expanding gas operates the top of the firearm known as the slide, . . . [the] slide moves to the rear, and what this does is pulls that fired cartridge case out of the chamber, extracts it and ejects it free of the firearm. As the slide gets all the | "[O]ne way" to pull the slide back is "to pinch it on both sides"—"[t]hat's why [the slide has] the little grooves, so you can get a hold of it to slide it back"—and move the slide in the direction of the gun. |

| KEIL | THE BAILIFF |
|---|---|
| way back and starts moving forward, it takes another live round, . . . and pushes it into the chamber at the same time recocking the hammer."<br><br>C. "[A]t this point the firearm is in a cocked position because the slide has been to the rear."<br><br>D. "[A]fter [the magazine is] loaded and inserted, the operator would then pull the . . . slide to the rear and release it, and what this . . . movement does [is to cause] that first live round to be pushed up inside the magazine a little bit, and part of the slide mechanism actually pushes on the back of it and pushes it into the chamber, and what this accomplishes is even if this hammer were in a forward position when they started, it's now cocked and held to the rear, so now I can simply, provided the safety is off, apply pressure to the trigger and discharge it." | |

5. <u>SUBJECT</u>: Time to Ready the Gun to Fire.

| KEIL | THE BAILIFF |
|---|---|
| ". . . I tried sweeping the hammer down with my thumb, sweeping it down to see how fast I could disengage [the safety] . . . . [¶] So with the natural movement of my thumb as I sweep it down, if I simply sweep my thumb down starting with . . . my thumb on top of the knurled lever, sweeping it and pulling it all the way down towards | In a response to one of the jurors' questions, the bailiff stated during his demonstration that if one is proficient with the weapon, he or she could release the safety, pull back the hammer or the slide, and fire the gun "in a second." |

| <u>KEIL</u> | <u>THE BAILIFF</u> |
|---|---|
| the grip, it frequently goes to a four- or five o'clock position, meaning that I can then pull the trigger." | |